# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

_____

PETER WELLS, et al.,

                                            Plaintiffs,

            vs.                                            9:16-CV-405
                                                           (GTS/ATB)

JEFF McKOY, et al.,

                                            Defendants.

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

PETER WELLS, Plaintiff pro se
PATRICK JEANTY, Plaintiff pro se
DERRICK FULTON, Plaintiff pro se
WAYNE WASHINGTON, Plaintiff pro se
CHRISTOPHER J. HUMMEL, Asst. Attorney General for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the Honorable Glenn T. Suddaby, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). In their civil rights complaint, the four plaintiffs, who are all practicing members of the Nation of Islam ("NOI"), allege that defendants violated their First Amendment right to practice their religion, their rights under the Religious Land Use and Institutionalized Persons Act, ("RLUIPA"), 42 U.S.C. § 2000cc-1(a), and their rights to equal protection under the Fourteenth Amendment by failing to provide meals that were consistent with NOI dietary restrictions during the holy month of Ramadan in 2014, while plaintiffs were incarcerated at Auburn Correctional Facility ("Auburn"). (Dkt. No. 1, "Compl." at CM/ECF pp. 4-14). Plaintiffs seek monetary and injunctive relief. (Compl. at CM/ECF

p. 15).

Presently before the court is the defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 53). Plaintiffs Wells, Jeanty, and Washington have filed responses in opposition to the motion, and plaintiff Washington has filed a cross-motion for summary judgment. (Dkt. No. 80, 83, 84). Defendants filed a reply to all defendants and a response to plaintiff Washington's cross-motion, and plaintiff Washington filed a reply in further support of his cross-motion. (Dkt. No. 85, 88). For the reasons set forth below, this court recommends granting defendants' motion for summary judgment as to all plaintiffs' claims. For the same reasons, this court also recommends denial of plaintiff Washington's cross-motion for summary judgment.

## DISCUSSION

### I.    Facts and Contentions

In 2014, Ramadan took place between June 28 and July 27, 2014. (Dkt. No. 71-8 at CM/ECF p. 15, "Schattinger Decl.", Ex. A). As plaintiff Wells described during his deposition, Ramadan is a month of purification for Muslims, including NOI members, that includes a thirty day fast. (Dkt. No. 71-2 at CM/ECF p. 24-25, Hummel Decl. Ex. A ("Wells Dep.") at 21-22). In addition to abstaining from food, NOI members abstain from negative behavior and negative thoughts, and focus on prayer and studying of the Quran. (Dkt. No. 71-2 at CM/ECF p. 131, Hummel Decl. Ex. B ("Jeanty Decl.") at 14). At sunrise, participants consume a light breakfast from a Sahor bag, that typically consists of cereal, eggs, whole wheat bread, and fruit. (Jeanty Decl. at 15; Dkt. No. 71-8 at CM/ECF p. 15, Schattinger Decl., Ex. A). They then abstain from eating for more

2

than sixteen hours, until sunset. (Wells Dep. at 22).  At Auburn, the dinner meal was typically provided around 9 p.m. (Dkt. No. 71-6, "Martin Decl." ¶ 13).

During Ramadan, observant NOI members make a concerted effort to abide by their religion's dietary restrictions. (Jeanty Dep. at 15-17).  Plaintiff Jeanty testified that NOI dietary requirements are based upon the extensive writings of Elijah Muhammad regarding proper diet and nutrition. (Jeanty Dep. at 16).  In following those protocols, plaintiffs generally abstain from beef, beef byproducts, white bread, certain types of beans, precooked or leftover food, white rice, white potatoes, and similar starches. (*Id*.)

Plaintiffs were all incarcerated at Auburn in June and July 2014, when the events described in the complaint occurred. (Compl. ¶ 6).  On June 2, 2014, defendant Shabazz, the NOI chaplain at Auburn, advised plaintiffs and other NOI inmates that only inmates who were already cleared to work in the Auburn mess hall would be permitted to assist in meal preparation during Ramadan. (Compl. ¶ 7).  This approach differed from prior years, when the NOI inmates were allowed to select temporary mess hall workers from among their members during Ramadan. (Wells Dep. at 23-24). Plaintiffs contend that this previous approach better ensured that mess hall workers were familiar with NOI mandatory dietary restrictions.  Plaintiffs also assert that these access restrictions were inconsistent with DOCCS policy, but defendants contend that they adhered to a policy that was in place since 2011. (Compl. ¶¶ 7-8; Dkt. No. 71-5. "Thomas Decl." ¶¶ 5-7).

Defendants contend that the policy did not prohibit workers who were not regular mess hall employees from assisting during religious holidays, but merely gave

3

preference to inmates who had already been cleared to work in the mess hall. (Thomas Decl. ¶ 8). They further contend that this preference reduced the risk of injury and food borne illness, by ensuring that all mess hall workers had been properly trained on the kitchen equipment and medically cleared to work with food. (Thomas Decl. ¶ 11-12). Defendants also assert that their reliance on inmates who had already been cleared for mess hall duty was a more efficient and economical use of facility resources. (Thomas Decl. ¶ 13-14).

In accordance with this policy, defendant Martin, the Auburn Food Service Administrator, and defendant Shabazz, the NOI chaplain, conferred to select the inmate cooks who would prepare the NOI Ramadan meals. (Martin Decl. ¶ 9; Dkt. No. 71-7, "Shabazz Decl." ¶ 8-9). Defendant Martin provided defendant Shabazz a list of six inmates who were mess hall workers and registered as NOI members, and defendant Shabazz selected two or three names from the list. (Martin Decl. ¶ 11; Shabazz Decl. ¶ 9). Plaintiffs contend that even if those inmates were registered as NOI members, they had limited involvement in the community, and possessed insufficient knowledge of NOI dietary requirements. (Wells Dep. at 24; Jeanty Dep. at 22, 24-26).

Plaintiffs contend that their fears about the mess hall staff were realized on the first day of Ramadan, when they were served white bread in violation of the NOI diet. (Compl. ¶ 18; Jeanty Dep. at 26). Plaintiffs all allege that they were repeatedly served foods during Ramadan that contained white flour or starch, as well as foods that were precooked or leftovers. (Compl. ¶ 13). They allege that these foods not only violated their religion, but also were inconsistent with the state-approved Ramadan menu ("State

4

Menu"). (*Id.*).   Plaintiffs also allege that some of the meals contained raw or undercooked food, such as chicken, that was inedible. (Compl. ¶ 16).  As a result of these assorted violations, plaintiffs allege that they were forced to choose between obeying their religion's dietary restrictions and eating a nutritionally sufficient meal after their fast.  Plaintiffs were frequently able to supplement their meal by saving part of the Sahor bag until the evening, or eating food that they purchased from the Auburn commissary. (Wells Dep. at 50-52; Jeanty Dep. at 33-34; Dkt. No. 71-2 at CM/ECF p. 222, Hummel Decl., Ex. C ("Fulton Dep.") at 27; Dkt. No. 71-2 at CM/ECF pp. 278-280, Hummel Decl., Ex. D ("Washington Dep." ) at 24-26)  On some evenings, plaintiffs did not eat any of the food prepared by the mess hall kitchen, due to the combination of prohibited and poorly prepared food items. (Wells Dep. at 51; Jeanty Dep. at 32, Fulton Dep. at 26-27; Washington Dep. at 25-27).

Plaintiffs also allege that other religions were granted greater access to the mess hall kitchen during religious holidays. (Compl. ¶ 33).   They have submitted the affidavit of Joseph Dexter, a Rastafarian inmate at Auburn, who asserts that he was permitted to work in the kitchen on Rastafarian holy days in May 2015, despite not being a regular mess hall employee. (Dkt. No. 71-2 at CM/ECF p. 362, Hummel Decl., Ex. F).  At his June 30, 2017 deposition, plaintiff Derrick Fulton testified that he observed several Rastafarian inmates being permitted access to the mess hall kitchen in 2014, even though they were not regular mess hall employees. (Fulton Dep. at 30). Defendants have no record of any special treatment being afforded Rastafarian inmates, and contend that all religions are treated equally with regard to mess hall access.

(Martin Decl. ¶ 17; Dkt. No. 83-3 at CM/ECF p. 44; Wells Decl. Ex. N).

## II.    **Summary Judgment**

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006).  "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial.  *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant.  *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin v. Goord*, 467 F.3d at 272.

III.    **Personal Involvement**

   A.    **Legal Standard**

   Personal involvement is a prerequisite to the assessment of damages in a section

1983 case, and respondeat superior is an inappropriate theory of liability.  *Richardson*

*v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).  In *Williams v. Smith*, 781 F.2d 319, 323-

24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant

can be personally involved in a constitutional deprivation, and thus be subject to

individual liability.

   A supervisory official is personally involved if that official directly participated

in the infraction.  *Id.*  The defendant may have been personally involved if, after

learning of a violation through a report or appeal, he or she failed to remedy the wrong.

*Id.*  Personal involvement may also exist if the official created a policy or custom under

which unconstitutional practices occurred or allowed such a policy or custom to

continue.  *Id.*  Finally, a supervisory official may be personally involved if he or she

were grossly negligent in managing subordinates who caused the unlawful condition or

event.  *Id.  See also Iqbal v. Hasty*, 490 F.3d 143, 152–53 (2d Cir. 2007) (citing *Colon*

*v. Coughlin*, 58 F.3d 865, 873) (2d Cir. 1995)), *rev'd on other grounds*, *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009).

   Some courts have discussed whether all of the *Colon* factors are still viable after

*Ashcroft*.  *See Conklin v. County of Suffolk*, 859 F. Supp. 2d 415, 439 (E.D.N.Y. 2012)

(discussing cases).  However, the court in *Conklin* ultimately determined that it was

unclear whether *Colon* had been overruled or limited, and continued to apply the

7

factors outlined in *Colon*. *Id.* In making this determination, the court in *Conklin* stated that "it remains the case that 'there is no controversy that allegations that do not satisfy any of the *Colon* prongs are insufficient to state a claim against a defendant-supervisor.'" *Id*. (quoting *Aguilar v. Immigration Customs Enforcement Div. of the U.S. Dep't of Homeland Sec.*, 811 F. Supp. 2d 803, 815 (S.D.N.Y. 2011)).

### B.     Application

#### 1.     Selection of Mess Hall Staff During Ramadan

The record demonstrates that defendant Thomas first developed Auburn policy's regarding the selection of mess hall staff during religious holidays in a memorandum dated February 15, 2011. (Dkt. No. 71-5 at CM/ECF p. 9, Thomas Decl., Ex. A). It also shows that plaintiffs alerted defendants Graham, McKoy, and Thomas about their concerns regarding the selection of mess hall staff immediately prior to Ramadan in 2014. (Dkt. No. 71-2, at CM/ECF p. 336, Hummel Decl., Ex. F). Defendants Martin and Shabazz contend that they were not personally involved in the development and implementation of the contested policy, and request summary judgment as to the claims arising from it. However, defendants Martin and Shabazz were involved in the actual selection of mess hall staff during Ramadan in 2014. (Martin Decl. ¶ 9; Dkt. No. 71-7, "Shabazz Decl." ¶ 8-9). Plaintiffs also contend that they expressed their concerns about the selected inmates to Martin and Shabazz prior to Ramadan in 2014. (Compl. ¶¶ 15-16). Therefore, plaintiffs have adequately alleged personal involvement of all defendants with regard to Auburn's policy on selection of NOI inmates to work in the mess hall during Ramadan.

8

## 2.     Violation of NOI Dietary Requirements During Ramadan

Plaintiffs have made a far more limited showing regarding individual defendants' personal involvement in the preparation and delivery of meals that allegedly violated NOI dietary requirements.  The record convincingly demonstrates that defendants Graham, McKoy, Thomas and Shabazz had no involvement in menu preparation or food service at Auburn. (Graham Decl. ¶ 26; Dkt. No. 71-3, McKoy Decl. ¶¶ 9, 24; Thomas Decl. ¶ 28; Shabazz Decl. ¶¶ 22-23).  Therefore, this court recommends granting summary judgment for defendants Graham, McKoy, Thomas, and Shabazz with regard to the alleged violations of NOI dietary restrictions, for lack of personal involvement.

In contrast, defendant Martin, as Auburn Food Service Administrator, was responsible for ordering the appropriate amount of food for Ramadan, and ensuring that meals were prepared and served consistent with the State Menu for religious holidays. (Martin Decl. ¶ 12; Graham Decl. ¶ 28).  Although defendant Martin states that she was not physically present when the evening Ramadan meals were prepared or served (Martin Decl. ¶ 23), plaintiffs have raised sufficient questions of material fact with regard to her control over mess hall operations to preclude a grant of summary judgment on this claim for lack of personal involvement.  Accordingly, this court will address the substance of all of plaintiffs' religious exercise and equal protection claims.[1]

---

[1] Plaintiffs exhausted the administrative grievance process for both the selection of mess hall staff and the food served during Ramadan. (Compl. ¶ 27-29).

## IV.    Religious Exercise Claims

### A.    Legal Standards

#### 1.    First Amendment Claims

Inmates have the right under the First and Fourteenth Amendments to freely exercise a chosen religion. *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). However this right is not limitless, and may be subject to restrictions relating to legitimate penological concerns. *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990). The analysis of a free exercise claim is governed by the framework set forth in *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987) and *Turner v. Safley*, 482 U.S. 78, 84 (1987). This framework is one of reasonableness and is less restrictive than the standard ordinarily applied to the alleged infringements of fundamental constitutional rights. *Ford*, 352 F.3d at 588.

In *O'Lone*, the Supreme Court held that a regulation that burdens a protected right withstands a constitutional challenge if that regulation is reasonably related to legitimate penological interests. 482 U.S. at 349 (quoting *Turner*, 482 U.S. at 89). An individualized decision to deny an inmate the ability to engage in a religious exercise is analyzed under the same standard. *Salahuddin v. Goord*, 467 F.3d 263, 274 n.4 (2d Cir. 2006) (citations omitted). In *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988), the Second Circuit held that to assess a free exercise claim, the court must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison

10

officials furthers some legitimate penological interest."

The Second Circuit has examined the standard for analyzing a First Amendment religion claim. *Holland v. Goord*, 758 F.3d 215, 220-22 (2d Cir. 2014). In *Holland*, the court discussed the degree of burden required for a First Amendment claim. *Id.* at 220-21. The court noted that it has not been decided in this Circuit whether, to state a claim under the First Amendment, the inmate must show at the onset that the disputed conduct "substantially burdens his sincerely held religious beliefs." *Id.* (citing *Salahuddin, supra* at 274-75; *Ford*, *supra* at 592 (where the court assumed without deciding that the substantial burden test applies)). The court in *Holland* did not decide the issue, rather the court assumed the continued validity of the substantial burden test and analyzed the case accordingly.[2] *Id.* This court will follow the analysis in *Holland* and proceed to consider the First Amendment analysis, assuming that the substantial burden test is still valid. *See also Williams v. Does*, 639 F. App'x 55, 56 (2d Cir. 2016) (discussing the unsettled status of the substantial burden test).

Once a substantial burden is found, the court must examine whether the challenged action has a legitimate, rational connection to the governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating that right; and the existence of alternative means of facilitating the exercise of that right that have only a *de minimis* adverse effect on the valid penological interests. *See King v. Bennett*, No.

---

[2] This finding was supported by the fact that the court's "precedent squarely dictat[ed] that Holland's religious exercise was unconstitutionally burdened," a point that the defendants in that case did not challenge on appeal. *Holland*, 758 F.3d at 221.

02-CV-349, 2007 WL 1017102, at *4 (W.D.N.Y.  March 30, 2007) (citing *Salahuddin*, 467 F.3d at 274).  Finally, once prison officials state a legitimate penological interest to justify their actions, the burden shifts to plaintiffs to show that the defendants' concerns are "irrational." *Ford*, 352 F.3d at 595.

### 2.    RLUIPA Claims

RLUIPA provides that

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person -
>
> > (A) is in furtherance of a compelling governmental interest; and
> >
> > (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).  Under RLUIPA, the plaintiff bears the burden of showing that his religious exercise has been burdened and that the burden is substantial.[3] *Marria v. Broaddus*, 200 F. Supp. 2d 280, 297 (S.D.N.Y. 2002) (citing 42 U.S.C. § 2000cc-2(b)).  The burden then shifts to the government to show that the burden furthers a compelling governmental interest **and** that it is the ***least restrictive*** means of achieving that interest. *Id.*  The act defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A).

A "substantial burden" is one that places "substantial pressure on an adherent to

---

[3] RLUIPA uses the term "substantial burden" in the language of the statute, removing any ambiguity with respect to the extent of the burden required to establish a statutory claim.

modify his behavior and to violate his beliefs." *Singh v. Goord*, 520 F. Supp. 2d 487, 498 (S.D.N.Y. 2007) (citing, *inter alia, Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996)). Inconvenience alone is insufficient to establish a substantial burden. *Id.* (citing *Westchester Day School v. Village of Mamaroneck*, 379 F. Supp. 2d 550, 557 (S.D.N.Y. 2005)). Furthermore, the substantial burden test presupposes that some inconveniences may be so minor that they do not amount to a violation. *See McEachin v. McGuinnis*, 357 F.3d 197, 203 n.6 (2d Cir. 2004) (discussing in a footnote the applicability of the "time-honored maxim '*de minimis non curat lex*'"). However, the court should not attempt to engage in resolving disputes as to whether a particular practice is "central" or "mandatory" to a particular religion in determining whether a burden was substantial. *See Ford v. McGinnis*, 352 F.3d 582, 593-94 (2d Cir. 2003) (discussing First Amendment protections).

### B.    Application

Plaintiffs raise two distinct, but related, religious exercise claims. First, they argue that defendants' refusal to allow the NOI community to select the inmates who would prepare and cook the meals served during Ramadan impermissibly burdened their ability to practice their religion. Second, plaintiffs claim that they were served food during Ramadan that was inconsistent with NOI dietary restrictions. Plaintiffs further contend that the meals were prepared improperly because defendants refused to allow the NOI inmates to select the most knowledgeable and observant members to work in the mess hall.

### 1.    Selection of Mess Hall Staff During Ramadan

Plaintiffs have not demonstrated that the Auburn policy governing the selection of mess hall employees during religious holidays substantially burdened their sincerely held religious beliefs during Ramadan 2014.  First, plaintiffs have not presented any evidence that the NOI has any requirements or guidance regarding who may prepare meals during Ramadan, or otherwise demonstrated a subjective "sincerely held belief" regarding who may prepare their food.  In reaching this determination, this court has considered the Second Circuit's warning that

> Our founding principles require that courts resist the dangerous temptation to try to judge the significance of particular devotional obligations to an observant practitioner of faith.  For it is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of these creeds.

*McEachin v. McGuinnis*, 357 F.3d 197, 201 (2d Cir. 2004).  Instead, a court should consider whether a plaintiff has "demonstrate[d] that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Ford*, 352 F.3d at 595 (quotation omitted).  In other words, the Second Circuit has "jettisoned the objective, content-based approach previously employed to define religious belief, in favor of a more subjective definition of religion, which examines an individual's inward attitudes towards a particular belief system." *Ford*, 352 F.3d at 588-89 (quoting *Patrick v. LeFevre*, 745 F.2d 153 (2d Cir. 1984)).

In depositions conducted in June 2017, all four plaintiffs testified at length about their subjective religious views.  Although all four plaintiffs expressed their preference of control over the individuals who prepared the Ramadan meals, none testified that

such control was a religious mandate. For example, plaintiff Wells testified that he was not aware of "any rules for members of the Nation of Islam regarding who is supposed to prepare the food for Ramadan meals." (Wells Dep. at 50). Plaintiff Fulton testified that "it would be preferred that we had someone that was more apt to knowing and understanding the significance of how our . . . meals are to be prepared . . . ." (Fulton Dep. at 15). Plaintiff Washington testified that "[d]uring Ramadan, a Muslim is supposed to have food that's prepared by a clean person." (Washington Dep. at 16). He also testified that ". . . what I do recall from the 2014 Ramadan, is that they had people preparing food who both wasn't a part of the community, which is not necessarily the issue but it's an issue when you have people preparing who obviously don't care if they have hygiene." (Washington Dep. at 16). Plaintiff Jeanty testified that "[i]t's pretty much very preferred that a practicing Muslim cook our meals." (Jeanty Dep. at 19). Based upon plaintiffs' own description of their faith, it is evident that control over who prepares their meals during Ramadan is, at most, a preference. Therefore, the defendants' interference with plaintiffs' stated preference does not violate plaintiffs' free exercise rights.

Moreover, even if plaintiffs' stated preference rose to the level of a religious belief protected by the First Amendment or RLUIPA, plaintiffs have not demonstrated that Auburn's Ramadan policy in 2014 imposed a substantial burden upon it. The strongest articulation of plaintiffs' position is plaintiff Jeanty's statement that it is "very preferred" that a practicing Muslim prepare Ramadan meals for the community. (Jeanty Dep. at 19). The record shows that defendants accommodated this view. Defendant

Martin prepared a list of NOI members who already were cleared to work in the mess hall, and defendant Shabazz relied on that list to select two or three individuals who would work during Ramadan. (Martin Decl. ¶¶ 4-6; Martin Decl. Ex. A; Shabazz Decl. ¶ 9.). All four plaintiffs concede that at least one of the inmates who prepared the Ramadan meals was from the NOI community, and therefore was a practicing Muslim. (Wells Dep. at 55; Jeanty Dep. at 24; Fulton Dep. at 16; Washington Dep. at 25). Therefore, plaintiffs have not demonstrated that a substantial burden arose from defendants' selection of one or more practicing Muslims to assist in the preparation of the Ramadan meals.

Even if the refusal to allow inmates to select the specific mess hall workers during religious holidays had imposed a substantial burden, summary judgment in favor of all defendants on this claim would still be appropriate. Defendants have offered a variety of valid penological interests for controlling the selection of mess hall staff. As set forth by defendant Thomas, the Auburn policy, as implemented in 2014, made it more likely that inmates selected to work in the mess hall had already been medically cleared to handle food, thereby reducing the potential spread of food-borne illnesses. (Thomas Decl. ¶ 11). Prioritizing existing mess hall workers also reduced the risk for injury or property damage from untrained use of mess hall equipment. (Thomas Decl. ¶ 12). In addition, allowing every religious group at Auburn to select mess hall staff for each religious holiday would have imposed a significant logistical burden on Auburn resources, by repeatedly requiring expedited medical evaluations and training. (Thomas Decl. ¶¶ 13-14).

In addition, plaintiffs had alternative means to ensure that individuals with appropriate dietary knowledge were present in the mess hall during religious meals. No Auburn policy prevented NOI community members from obtaining approval to work as a mess hall worker on a regular basis. (Graham Decl. ¶ 16; Thomas Decl. ¶ 18). Indeed, plaintiff Fulton, who is still incarcerated at Auburn, testified that religious meal service improved after 2014, when NOI members who worked in the mess hall became more experienced and knowledgeable about the religious dietary restrictions. (Fulton Dep. at 28-29). Plaintiffs have failed to show that defendants' rationale for the policy was irrational. Accordingly, this court recommends granting defendants' motion for summary judgment as to all claims arising from the selection of mess hall staff during Ramadan 2014.

### 2.    Violation of NOI Dietary Requirements During Ramadan

The Second Circuit has stated that it is "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples . . . ." *Ford*, 352 F.3d at 597 (citations omitted). Therefore, to "deny prison inmates the provision of food that satisfies the dictates of their faith . . . unconstitutionally burden[s] their free exercise rights." *McEachin v. McGuinnis*, 357 F.3d 197, 203 (2d Cir. 2004). Plaintiffs have demonstrated that compliance with NOI dietary requirements is a major part of their observance of Ramadan. (Wells Dep. at 21-22; Jeanty Dep. at 14). Defendants do not dispute the sincerity of plaintiffs' beliefs, but contend that plaintiffs' dietary restrictions and nutritional needs were adequately met during Ramadan. To support this argument, defendants assert that each meal complied with the State Menu that is implemented at

all DOCCS facilities, including Auburn.[4] (Schattinger Decl. ¶ 4).

The State Menu provides that every evening meal during Ramadan should consist of a salad, a protein entree, six slices of whole wheat bread, one or two servings of fruit, one or two servings of vegetables, one or two starch-based side dishes, a beverage, and a dessert.  (Schattinger Decl. ¶ 12, Ex. A).  The main course consisted of a rotation of baked fish, halal chicken patties, omelets with vegetables and cheese, baked halal chicken, whole-wheat pizza, macaroni and cheese, and grilled cheese sandwiches. (Schattinger Decl. Ex. A).

Plaintiffs claim that they repeatedly received evening meals during Ramadan that failed to meet their dietary requirements, and failed to comply with the State Menu.[5] None of the plaintiffs allege an outright denial of evening meals.  Instead, they have alleged numerous instances in which some portion of the meal contained food that was inconsistent with NOI dietary requirements, or was otherwise poorly prepared.

For example, plaintiffs were served white bread on the first day of Ramadan, even though the State Menu listed wheat bread. (Compl. ¶ 13; Jeanty Dep. at 26). Plaintiffs also submitted a list of specific dates on which they were served food items

---

[4] Because defendants have only argued that the meals were compliant with NOI dietary restrictions and therefore did not impose a burden, this court will not engage in the *O'Lone/Turner* analysis with respect to this claim.

[5] To the extent that plaintiffs claim that the Ramadan meals do not comply with a state policy such as the State Menu, a violation of state policy would not give rise to a constitutional claim under § 1983. *See Ahlers v. Nowicki*, No. 9:12-CV-539 (DNH/RFT), 2014 WL 1056935, at *4 (N.D.N.Y. Mar. 18, 2014) ("[C]laims involving the improper adherence to proprietary facility policies are incognizable under § 1983; only rights secured by the Constitution and federal law are actionable under § 1983.") (citations omitted).

during the evening meal that failed to meet their dietary restrictions. (Dkt. No. 71-2 at
CM/ECF p. 359, Hummel Decl., Ex F). This includes five dates on which they were
served a prohibited dessert item that included white flour, such as cake with icing,
bread pudding, chilled rice pudding, or orange sherbert ice cream. (*Id*.) The list also
includes three items of "cooked chilled food" (cole slaw, potato salad, and macaroni
salad) that were served as a side dish on numerous occasions, in violation of the NOI
dietary restriction against foods that were not prepared on the day that they were
served. (*Id*.). Plaintiffs also specified five dates on which they received white rice, an
impermissible starch. (*Id*.) They also specified five different dates on which they were
served green peas.[6] (*Id*.) Plaintiffs' list also alleges one instance when they were served
a beef patty containing soy, and another when they received raw or undercooked
chicken. (*Id*.; Wells Dep. at 37) During their depositions, some of the individual
plaintiffs recalled other discrete occurrences when the food served was objectionable,
but many of these were related to personal taste. (Wells Dep. at 38; Fulton Dep. at 17).

Even when viewed in the most favorable light, none of the plaintiffs have shown
a substantial burden on their religion. Isolated deprivations of a religious meal have
historically been found to impose only de minimis burdens on an inmate's free exercise
rights. *See McEachin v. McGuinnis*, 357 F.3d 197, 203 (2d Cir. 2004) ("[t]here may be
inconveniences so trivial that they are most properly ignored"); *Washington v. Afify*,

---

[6] Plaintiffs do not all agree that green peas always violated NOI dietary restrictions.
Plaintiffs Jeanty, Fulton, and Washington testified that green peas were always prohibited, but
plaintiff Wells testified that his only objection to the green peas was that they were uncooked.
(Jeanty Dep. at 30; Fulton Dep. at 40; Washington Dep. at 15; Wells Dep. at 37)

968 F. Supp. 2d 532, 538-39 (W.D.N.Y. 2013) (plaintiff's allegations that he was denied two religious breakfast meals and one evening meal was only minimally burdensome on his religious practice). However, the Second Circuit recently cautioned against making conclusory judgments about the de minimis impact of missed religious meals, which may still be important to the religious practice of the adherent. *See Williams v. Does*, 639 F. App'x 55, 57 (2d Cir. 2016) (vacating dismissal of plaintiff's claim that defendants refused to serve Ramadan meals after sunset on five occasions).

This case is readily distinguishable from *Williams*. First, plaintiffs have not alleged that defendants ever denied them a meal during Ramadan. More significantly, *Williams* involved a 12(b)(6) motion to dismiss. In this case, defendants have moved for summary judgment after the completion of discovery. As a result, the record in this case is well-developed regarding the burden imposed on plaintiffs' observance of Ramadan, as described in plaintiffs' own deposition testimony. That testimony shows that the alleged inadequacies in portions of some of their evening meals presented only a minimal intrusion into plaintiffs' ability to maintain their fast. *See Perrilla v. Fischer*, No. 13-CV-398M, 2013 WL 5798557, at *5 (W.D.N.Y. Oct. 28, 2013) (denial of additional portions and occasional "ill-prepared meals . . . prepared by non-believers" during Ramadan did not impose a substantial burden). Plaintiffs' religious objections to the meals almost exclusively involved side dishes and dessert items, such as white rice or cake. (Dkt. No. 71-2, at 359). In addition, all of the plaintiffs testified that they would regularly supplement their evening meal with religiously permissible food purchased from the commissary, or with food saved from the morning Sahor bag.

20

(Wells Dep. at 50-52; Jeanty Dep. at 33-34; Fulton Dep. at 27; Washington Dep. at 24-26). *See DeJesus v. Bradt*, 174 F. Supp. 3d 777 (W.D.N.Y. 2016) (policy prohibiting inmate from taking hot food from mess hall during Ramadan, but allowing purchase of commissary food to consume in his cell did not impose a substantial burden). Although plaintiff Jeanty testified that there were some days that he refused to eat anything at all, he also testified that was a result of unrelated stress, rather than a lack of religiously compliant food with which to break his fast.[7] (Jeanty Dep. at 33-34).

Accordingly, plaintiffs have failed to state a claim for relief under the First Amendment or RLUIPA. Therefore, this court recommends granting defendants' motion for summary judgment as to all plaintiffs' religious exercise claims.

### 3.    Additional Grounds for Dismissal of Certain RLUIPA Claims

This court will also briefly address additional grounds for dismissal of most of plaintiffs' RLUIPA claims. Plaintiffs seek monetary and injunctive relief in their complaint. (Dkt. No. 1, at CM/ECF p. 11). RLUIPA does not authorize claims for money damages against state officers in either their individual or official capacities. *Holland*, 758 F.3d at 224. Therefore, all four plaintiffs' monetary RLUIPA claims would be subject to dismissal. In addition, plaintiffs Wells, Jeanty, and Washington are no longer housed at Auburn. (Dkt. Nos. 24, 41, 43). Their transfer to another facility mooted claims for declaratory or injunctive relief against Auburn officials. *Shepherd v. Goord*, 662 F.3d 603, 610 (2d Cir. 2011) (citing *Salahuddin v. Goord*, 467 F.3d 263,

---

[7] Plaintiff Jeanty testified that ". . . I remember that particular year was a trying time and a stressful moment for me during that Ramadan and I had a hard time even touching anything in that mess hall." (Jeanty Dep. at 33).

272 (2d Cir. 2006)); see also *Wright v. New York State DOCCS*, 568 F. App'x 53, 55 (2d Cir. 2014); *Wood v. Captain Colon*, No. 3:13-CV-1467, 2016 WL 2930882, at *3 (D. Conn. May 18, 2016). Because plaintiff Fulton is still housed at Auburn, the mootness doctrine would not apply to his RLUIPA claims for injunctive relief.

## V.    **Equal Protection**

### A.    **Legal Standards**

The Equal Protection Clause of the Fourteenth Amendment provides that the government shall treat all similarly-situated people alike. *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) (citing *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). Generally, the equal protection clause has been "concerned with governmental 'classifications that affect some groups of citizens differently than others.'" *Engquist v. Or. Dep't of Agric.*, 533 U.S. 591, 601 (2008). To establish an equal protection violation, plaintiffs must show that the defendants applied a different standard to similarly situated individuals. *Skehan v. Village of Mamaroneck*, 465 F.3d 96, 111 (2d Cir. 2006). Plaintiffs must first show that they were treated differently than others similarly situated because of intentional or purposeful discrimination. *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005). Then, plaintiffs must show that the difference in treatment cannot survive the appropriate level of scrutiny. *Id.*

### B.    **Application**

Plaintiffs contend that the NOI community was treated differently than other religions with regard to religious holidays. They rely upon the sworn affidavit of Joseph Dexter, a Rastafarian inmate at Auburn, who stated that he was assigned "as one

22

of many" to prepare food in the Auburn mess hall for an unspecified Rastafarian holiday in May 2015. (Dkt. No. 71-2 at CM/ECF p. 362, Hummel Decl., Ex. F; Dkt No. 84-3, at 12). Mr. Dexter stated that he did not have a food handler certificate and had not received a medical clearance examination prior to working in the mess hall. (*Id.*) Plaintiff Fulton also testified that he observed unidentified Rastafarian inmates exiting the mess hall kitchen toward the end of Ramadan in 2014. (Fulton Dep. at 30).

As described above, an Equal Protection claim must state that the defendants applied a different standard to similarly situated individuals. Although the pleading standard does not require "detailed factual allegations," it does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). Furthermore, a complaint does not suffice if it tenders 'naked assertion[s] devoid of 'further factual enhancement.'" *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 555, 557).

Applying that test, this court must conclude that plaintiffs have failed to state an equal protection claim. Even assuming that Mr. Dexter was not a regular mess hall worker, plaintiffs have not presented any evidence that defendants applied a different standard to NOI and Rastafarian inmates. All parties agree that the relevant policy prioritizes inmates who have already been cleared to work in the mess hall. It further provides, "[i]f the Food Service Administrator and chaplain are unable to identify enough inmates of that faith group that are programmed in the Mess Hall, then the chaplain may suggest other non-Mess Hall inmates of that faith group to cook." (Dkt. No. 71-5, Thomas Decl. Ex. A, at CM/ECF p. 9). Plaintiffs have offered no evidence to

suggest that Auburn officials did not follow that approach when Mr. Decker worked in the mess hall in 2015. They have also offered no evidence that Mr. Decker was selected instead of other Rastafarian inmates who already worked in the mess hall. In addition, Mr. Decker's May 2015 service in the mess hall came almost a full year after the NOI Ramadan took place in June and July 2014. The only other evidence offered to support plaintiffs' equal protection claim is plaintiff Fulton's speculation that certain unidentified inmates were allowed greater access to the mess hall. Therefore, plaintiffs have not demonstrated that the defendants treated the NOI community differently than similarly situated individuals, let alone that such disparate treatment was the result of intentional or purposeful discrimination. Accordingly, this court recommends that defendants be granted summary judgment as to plaintiffs' equal protection claim. Thus, the entire complaint may be dismissed.[8]

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 71) be **GRANTED**, and the complaint **DISMISSED IN ITS ENTIRETY**, and it is further

**RECOMMENDED** that plaintiff Washington's cross motion for summary

---

[8] Defendants also argued that summary judgment was appropriate on qualified immunity grounds. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Because this court has found that the defendants have not violated plaintiffs' rights in the first instance, it need not reach the issue of whether a reasonable person would have known of the violation.

24

judgment (Dkt. No. 84) be **DENIED**.[9]

      Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636 (b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated:     May 7, 2018

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**

---

[9] Plaintiff Washington moved for summary judgment on all claims. Because this court is recommending that defendants' motion for summary judgment be granted on all claims, I relied on the analysis set forth herein to also recommend denial of plaintiff Washington's cross-motion seeking identical relief.